# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 22, 2012

No. 11-10020

Lyle W. Cayce
Clerk

SHOMARI STATEN

Plaintiff-Appellee

v.

DAVID TATOM

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:10-CV-342

Before HIGGINBOTHAM, DAVIS, and STEWART, Circuit Judges.

W. EUGENE DAVIS:[*]

Officer David Tatom (Defendant or Tatom) challenges the district court's denial of qualified immunity to him for his search, seizure, and alleged use of excessive force against Plaintiff Shomari Staten (Plaintiff or Staten). For the reasons given below, we REVERSE the district court's denial of qualified immunity for the search and seizure and AFFIRM its denial of qualified immunity on the excessive force claim, and its order denying summary judgment on Plaintiff's state law claims.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-10020

## I. FACTS

Plaintiff owns a used car business in Garland, Texas. In February 2009 he sold a car to a customer who lived in a nearby town. Plaintiff agreed to deliver the car to the customer at a parking lot in Carrollton, Texas on the afternoon of Saturday, February 21, 2009. On that date at approximately 2:00 p.m. Plaintiff and a business associate went to the parking lot. While waiting for the customer to arrive, Plaintiff removed the dealer tags from the vehicle being sold and put a temporary paper dealer license plate on the vehicle. Two witnesses saw Plaintiff do this from across the parking lot, thought his behavior was suspicious, and called 911 to report what they suspected was an automobile theft. Meanwhile, Plaintiff got back into the front passenger seat of another vehicle driven by his business associate.

Shortly thereafter, Officer Palmer (Palmer) from the Carrollton Police Department arrived on the scene. A dash camera was on Palmer's vehicle and videotaped most of the incident that followed.

Palmer approached the driver's side of the vehicle and began to question Plaintiff's business associate. Palmer then asked for driver's license and insurance. It is unclear from the video whether he was addressing only the driver, or both the driver and Plaintiff. Soon thereafter Defendant Officer Tatom arrived on the scene and stood, as back-up, near the back of the car on the passenger side.

At some point Plaintiff realized he knew Officer Palmer. Because Plaintiff was on the passenger side of the vehicle where Palmer could not see him, Plaintiff got out of the vehicle to give Palmer a clear view of him so that he would recognize him. At no point prior to exiting the vehicle was Plaintiff ordered to remain in it. When Plaintiff exited, Defendant Tatom hovered his hand over his gun and went to search Plaintiff.

No. 11-10020

Defendant argues Plaintiff's hand was concealed underneath his "hoody" sweater when he got out of the car. Plaintiff claims that at no time were either of his hands concealed and the video is not clear enough to determine this. In the video, Plaintiff does not appear to exit the car more quickly than would be normal. The district court found, and the video confirms, that at no point did Plaintiff make any sudden or violent movements, or otherwise move towards Defendant in a threatening or challenging manner.

As Defendant began his search, Plaintiff appeared compliant, facing away from Defendant and toward the car. Defendant began by frisking Plaintiff along his torso and waist, and Plaintiff informed Defendant, "I have a concealed weapons license." Defendant then found Plaintiff's firearm and took possession of it. Plaintiff is heard repeating, "I have a concealed weapons license."

Defendant then quickly and forcefully pulled Plaintiff backward and downward, pushing Plaintiff towards and into the car parked behind them and ultimately to the ground. Officer Palmer ran around the vehicle to assist Defendant, stopping a few feet from Defendant and Plaintiff. After Defendant placed the firearm on the hood of the neighboring car, he pulled Plaintiff to his feet by Plaintiff's right arm. He then used his control of Plaintiff's arm to push Plaintiff in front of him, toward the car out of which Plaintiff had exited, where Defendant and Palmer secured Plaintiff's hands behind his back. Plaintiff continued to ask "what are you doing? I have a concealed weapons license." At this point, Plaintiff claims the officer had him under his control and had removed any perceived threat. Defendant disagrees, claiming Plaintiff – now and once on the ground – resisted Defendant's efforts to place him under control. Defendant then proceeded to execute a takedown of Plaintiff, bringing Plaintiff to his hands and knees. This placed Defendant's body between the camera and Plaintiff's torso and back. Plaintiff claims that throughout this time Defendant was using his grip on Plaintiff's arms to twist his arms and shoulders, causing

3

No. 11-10020

injuries to his shoulders, hand, and wrists, and pain.  Defendant denies these accusations and claims simply to have been restraining him.  Defendant then pushed Plaintiff forward from an all-fours kneeling position until Plaintiff was flat on his stomach, where Defendant handcuffed Plaintiff and completed the patdown search.

Plaintiff maintains he was not struggling or resisting throughout this encounter.  Defendant claims otherwise, that Plaintiff was both physically resisting and disobeying his verbal commands.  On the video, Defendant can be heard yelling that Plaintiff should quit resisting, and Plaintiff can be heard yelling that he is not resisting and the officers are going to break his arm.  The parties also stridently disagree about the amount of force that was used in the encounter.  For instance, Plaintiff characterizes that he was "slammed" into the car parked behind him and "thrown violently to the ground where Officer Tatom continued to forcefully dig his knee into Staten's body and continued to slam Staten while Officer Tatom handcuffed him."  Similarly, Plaintiff emphasizes the district court's observation that, upon initially finding the handgun, Defendant "takes his right hand, grabs the top of Staten's head, and yanks it backwards."  Officer Tatom disputes these characterizations, claiming he used only the force that was necessary to gain control of Plaintiff and secure his own safety.

The video shows that Plaintiff was eventually put in Defendant's squad car where he remained for 15-20 minutes.  The customer who was purchasing the car from Plaintiff arrived and confirmed Plaintiff's story. Plaintiff was released and no charge was filed.

As a result of the incident, Plaintiff claims to have experienced pain in his knees, back, and head, and bruising on his wrists, and that these injuries required him to undergo hand surgery.

Plaintiff claims that following his release from custody, he told Defendant that he would file a complaint against him, which he did at the City of Carrollton

4

No. 11-10020

Police Department the following Monday, February 23, 2009. Plaintiff also made a freedom of information request for a copy of the dashcam video.

On March 3, 2009, Defendant presented a judge with affidavits for two arrest warrants, to arrest Plaintiff for resisting arrest, and for refusing to display his concealed handgun license upon a peace officer's demand to see his identification. The affidavits recounted Defendant's version of events, including that Plaintiff suddenly got out of the car and stood with his left hand in his jacket, that Plaintiff resisted throughout the encounter, and that Plaintiff failed to show his concealed weapons license after Officer Palmer made two requests for identification, the second directed specifically at Plaintiff. The warrants were granted on the basis of these affidavits.

On March 19, 2009, Plaintiff returned to the City of Carrollton Police Department to check on his records request. When Plaintiff inquired about the video, two police officers came out, handcuffed Plaintiff, and arrested him based on the warrants to which Defendant had attested. Plaintiff claims he was then brought to the interrogation room, being manhandled along the way, and asked if he really wanted to pursue his complaint against Defendant. Plaintiff said he did, and he was jailed until bond was posted. The City attempted to press the charges, but the Dallas County District Attorney's Office dismissed them.

Plaintiff also contends that Defendant filed a report with the Texas Department of Public Safety based on the allegation that Plaintiff failed to display his concealed handgun license. The Department reviewed the incident, including the dashcam video, and declined to suspend Plaintiff's concealed handgun license.

## II.  ANALYSIS

**STANDARD OF REVIEW AND QUALIFIED IMMUNITY GENERALLY**

"We review de novo a district court's denial of a motion for summary judgment on the basis of qualified immunity." *Kovacic v. Villarreal*, 628 F.3d

No. 11-10020

209, 211 (5ᵗʰ Cir. 2010).    Summary judgment is appropriate when it is determined that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). A denial of a motion for summary judgment on the issue of qualified immunity is immediately appealable, to the extent that the district court's order turns on an issue of law.  *Good v. Curtis*, 601 F.3d 393, 397 (5th Cir. 2010).  We do not have jurisdiction to review the genuineness of any factual disputes but can decide whether the factual disputes are material. *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000).

The doctrine of qualified immunity shields a government official performing discretionary functions from civil damages liability, provided his complained of actions meet the test of "objective legal reasonableness."  *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982).  We assess the "objective reasonableness" of an officer's actions in light of the particular circumstances and the legal rules "clearly established" at the time the officer's actions were taken.  *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

**PLAINTIFF'S CLAIMS**

All of Plaintiff's claims arise under the Fourth Amendment.  "[I]n . . . Fourth Amendment contexts . . . the 'reasonableness' inquiry . . . is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham v. Connor*, 490 U.S. 386, 397 (1989).

Plaintiff makes three claims, relating to the alleged (A) unlawful search, (B) unlawful detention, and (C) excessive force used against him.  These claims are addressed in turn.

**Unlawful Search/Unlawful Detention**

The Supreme Court defined the requirements for conducting a frisk or patdown of a suspect as follows:

No. 11-10020

In . . . *Terry v. Ohio*, 392 U.S. 1 (1968), the [Supreme] Court considered whether an investigatory stop (temporary detention) and frisk (patdown for weapons) may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures. The [Supreme] Court upheld "stop and frisk" as constitutionally permissible if two conditions are met. First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.

. . . .

*Terry* involved a stop for interrogation of men whose conduct had attracted the attention of a patrolling police officer. The officer's observation led him reasonably to suspect that the men were casing a jewelry shop in preparation for a robbery. He conducted a patdown, which disclosed weapons concealed in the men's overcoat pockets. This Court upheld the lower courts' determinations that the interrogation was warranted and the patdown, permissible. See *id*., at 8.

*Terry* established the legitimacy of an investigatory stop "in situations where [the police] may lack probable cause for an arrest." *Id*., at 24. When the stop is justified by suspicion (reasonably grounded, but short of probable cause) that criminal activity is afoot, the Court explained, the police officer must be positioned to act instantly on reasonable suspicion that the persons temporarily detained are armed and dangerous. *Ibid*. Recognizing that a limited search of outer clothing for weapons serves to protect both the officer and the public, the Court held the patdown reasonable under the Fourth Amendment. *Id*., at 23–24.

*Arizona v. Johnson*, 555 U.S. 323, 326-27, 330 (2009).

The district court found that if Plaintiff exited the vehicle with his hands concealed, then the search was justified, but if he exited with his hands visible, then the search was illegal. The court concluded that this was a question of fact the precluded summary judgment.

7

No. 11-10020

The district court based its analysis on this Court's ample traffic stop jurisprudence. We disagree with this analysis because this case was not a traffic stop. Rather, it is analogous to *Terry*, where an officer came upon a scene with reasonable suspicion a felony was in progress,[1] identified himself as an officer, and, in the course of investigating the crime, conducted a search "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Terry*, 392 U.S. at 26. The Supreme Court found an unintrusive pat down justified in such an instance in the interest of officer safety. When the officer's pat down revealed the firearm, the search was justified, along with the short detention.

**Excessive Force**

A suspect has a clearly established right under the Fourth Amendment to be free of excessive force when an officer is executing a search or arrest. *See Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005). The Supreme Court has articulated the relevant inquiry as follows:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake. *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. See *Terry v. Ohio*, 392 U.S., at 22–27. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559 (1979),

---

[1] As in *Terry*, the officer here had more than a "hunch" a crime was in progress. The informant engaged in an extended conversation with the 911 operator, describing Plaintiff and his car in detail and identifying specific acts – the taking off of the car's license plate, which is not ordinarily done in a store parking lot – giving rise to a suspicion of illegality.

however, its proper application requires careful attention to the facts and circumstances of each particular case.

*Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation formatting adjusted). The relevant question is thus whether, taking Plaintiff's version of the facts as true, the force used by the officer was both excessive to the need and objectively unreasonable, asking "'whether the totality of the circumstances justifies a particular sort of seizure.'" *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). Important factors to be considered include the nature and quality of the intrusion on the individual's Fourth Amendment interests, the severity of the crime, whether the actor poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor*, 490 U.S. at 396.

Here, Defendant argues that he strictly complied with the City's Use of Force Directives to take Plaintiff under control by taking him to the ground once he found Plaintiff's weapon.[2] The district court found that "upon finding a weapon after doing a search the City of Carrollton's protocol is to drop the suspect to the ground," and that, while Defendant's compliance with this directive is "not prima facie evidence that Tatom's response was constitutional, it is evidence that Tatom's response was at least objectively reasonable to an ordinary officer." However, the district court also found that "the manner in

---

[2] These Directives are as follows:

  If, during the process of conducting a Cursory Search, the searching officer finds a gun, the officer should grab the weapon . . . At this time, the searching officer should simultaneously take the suspect's weapon, drop the suspect to the ground, and draw his service weapon. Follow up the take down with a prone search . . . The reason for putting the suspect on the ground in both situations is that the armed suspect is dangerous to the officer as long as he is on his feet and able to attack. There is also the possibility that the suspect might overpower the officer, and gain a serious advantage. When a suspect is properly dropped to the ground, he will be disoriented, giving the officer an advantage.

No. 11-10020

which Tatom took Staten to the ground was particularly forceful, especially considering Staten states he was not resisting arrest," and that "the manner in which Tatom took down Staten could be construed by a reasonable person as objectively unreasonable."

We agree with the district court. The parties present a number of disputes of material fact, including, objectively, whether or how much Plaintiff was resisting, the amount of force Defendant actually used at each stage of the encounter, and whether that force was reasonable. The parties also dispute whether Plaintiff had his hands hidden upon stepping out of the vehicle, which implicates the "immediate threat to the safety of the officers."[3]  *Graham v. Connor*, 490 U.S. at 396.

Accordingly, we conclude that the district court correctly denied qualified immunity to the Defendant on Plaintiff's excessive force claim.

**State Law Claims**

The district court also denied summary judgment to Defendant as to Plaintiffs' state law claims of malicious prosecution and assault and battery. We have jurisdiction to review a denial of immunity under Texas law on an interlocutory appeal.  *Murray v. Earle*, 405 F.3d 278, 284 (5th Cir. 2005).

Under Texas law, "[o]fficial immunity is an affirmative defense that protects government employees from personal liability."  *University of Houston v. Clark*, 38 S.W.3d 578, 580 (Tex. 2000). "A governmental employee is entitled to official immunity: (1) for the performance of discretionary duties; (2) within the scope of the employee's authority; (3) provided the employee acts in good faith."  *Id*. "Because official immunity is an affirmative defense, to obtain summary judgment on official immunity, the governmental employee must

---

[3] The video is ultimately inconclusive as to these questions, so for the purposes of this opinion we must assume they are resolved in Plaintiff's favor.

conclusively prove each element of the defense." *Id.* A disputed issue of material fact as to any element defeats the defense. *Id.*

For each claim, the parties only contest Defendant's compliance with the good faith element. Like qualified immunity, the good-faith standard focuses on the objective legal reasonableness of the officer's conduct. See *Kinney v. Weaver*, 301 F.3d 253, 285 (5th Cir. 2002).

Under Texas law, "[a] plaintiff in a malicious criminal prosecution claim must establish (1) the commencement of a criminal prosecution against the plaintiff; (2) causation (initiation or procurement) of the action by the defendant; (3) termination of the prosecution in the plaintiff's favor; (4) the plaintiff's innocence; (5) the absence of probable cause for the proceedings; (6) malice in filing the charge; and (7) damage to the plaintiff." *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517 (Tex. 1997). "In an action for malicious prosecution, where the arrest is made under lawful process, the injured party must proceed against the party who set the process in motion and must allege malice and want of probable cause." *Sagebiels, Inc. v. Walker*, 498 S.W.2d 271, 274 (Tex.App.–Austin 1973).[4]

Plaintiff was arrested for resisting arrest and failing to display his handgun license when demanded by a peace officer. Under Texas law, a person commits the offense of resisting arrest "if he intentionally prevents or obstructs a person he knows is a peace officer . . . from effecting an arrest . . . by using force against the peace officer or another." Tex. Pen.Code Ann. § 38.03 (Vernon 2011). A person commits the offense of failing to display a handgun license when

---

[4] In *Smith v. Davis*, the court found that the conduct of an officer making an affidavit in support of an arrest warrant in bad faith can be considered in a malicious prosecution claim but "express[ed] no opinion on the merits of a claim for malicious prosecution based solely on the act of filing an affidavit for an arrest warrant." 999 S.W.2d 409, 414, n. 2 (Tex.App.–Dallas, 1999). This point was not briefed, and we also express no opinion on this issue.

"a license holder is carrying a handgun on" his person when "a peace officer demands that the license holder display identification," and "the license holder" fails to "display both" his identification and his "handgun license." Tex. Gov't Code Ann. § 411.205 (Vernon 2009).[5] The district court did not err in finding issues of fact were presented about 1) whether Defendant, in swearing to the affidavits that were the basis of Plaintiff's arrest, had an objectively reasonable belief that Plaintiff was "resisting arrest" "by using force against the" officer, and 2) whether an officer asked Plaintiff for his identification. These factual disputes also precluded a finding that the officer had probable cause to arrest Plaintiff. Likewise, we find no error in the district court's conclusion that "the manner in which [Plaintiff claims he] was treated at the police department," if true, could provide evidence of the malice element.

Finally, regarding the assault and battery claims the district court noted that the record was not developed and that "[n]either party addresse[d] [the claims] with much specificity." Based on our discussion above in which we agree with the district court that questions of fact were presented on whether Defendant used excessive force in taking Plaintiff to the ground, we conclude that the district court did not err in denying summary judgment to Defendant on these claims.

Accordingly, we AFFIRM the district court's denial of Defendant's immunity defense as to Plaintiff's state law claims.

## CONCLUSION

For the reasons given above, we REVERSE the district court's ruling denying qualified immunity as to Plaintiff's search and seizure claims and AFFIRM the district court's rulings denying Defendant's qualified immunity defense as to Plaintiff's excessive force claim, and its order denying summary

---

[5] This section was amended subsequent to the incident, though it remained the same in all respects relevant here.

judgment on Plaintiff's state law claims.  We REMAND this case to the district court for further proceedings consistent with this opinion.

Judge Stewart concurs in the judgment only.