JENNIFER WALKER ELROD, Circuit Judge,
concurring in part and dissenting in part:
I concur in the result on all of the claims except those against Corporal James Creighton (“Corporal Creighton” or “Creighton”). Viewing the facts in the light most favorable to plaintiff Roger L. Poole (“Poole”), fact issues exist as to whether Creighton is entitled to qualified immunity. Therefore, I would send Poole’s excessive force claim against Creighton to the jury.[1]
I.
The majority opinion is correct that the videotape that captured most of the events relevant to this case “significantly aids our understanding” of them and that we must “view[ ] the facts in the light depicted by the videotape.” See Scott v. Harris, 550 U.S. 372, 381, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Sincere respect for my able colleagues in the majority compelled me to review the videotape in this case yet again with a critical eye to those facts that the majority opinion impugns as false. Because the videotape evidence is so central to this case, I have included references to the precise times in the videotape that the different events occurred. To aid the reader in evaluating this evidence, the videotape is attached as an appendix to this dissenting opinion so that it can “speak for itself.” Id. at 379 n. 5, 127 S.Ct. 1769 (publishing videotape of events relevant to an excessive use of force case and indicating that the majority was “happy to allow the videotape to speak for itself’).
The majority opinion’s disagreement about the videotape evidence only underscores why this case should go to a jury. Nowhere does the majority opinion indicate that Creighton would be entitled to qualified immunity under my understanding of the facts. Thus, at bottom, ours is a factual dispute, not a legal one, and thus a jury should resolve it.
Proceeding to the facts, Poole testified that he was driving down the interstate early in the morning when he looked in his rear-view mirror and noticed a pickup truck tailgating him. He tossed some water out his own truck’s window at the tailgating pickup. What Poole did not know was that Corporal Creighton, an off-duty police officer, was driving the tailgating pickup. Creighton radioed for an on-duty officer to pull Poole over, and uniformed officer Sergeant John D. Stalnaker (“Stalnaker”) arrived shortly to stop Poole for “driving recklessly and carelessly.” Both Stalnaker and Creighton later testified that they only planned to give Poole a ticket.
Stalnaker and Creighton testified that they approached Poole’s truck once he pulled over. As Creighton approached, he pulled his shirt up to reveal the service weapon he was carrying. Once Poole was out of his truck, Creighton grabbed his arm and pulled him to the back of his truck to pat him down. After the pat down, Poole leaned against Creighton’s pickup. Creighton ordered Poole to get his “mother f — ing a- - off’ his truck. He demanded “restitution” and told Poole that he knew where Poole lived; he would get “satisfaction”; and he would throw Poole’s “f — ing a- - in jail.” Stalnaker testified that because Poole smelled of alcohol and had admitted to consuming eight ounces of beer at some point earlier that morning, he was given a field sobriety test and passed. Other officers soon arrived on the scene to *636 assist Stalnaker with paperwork. One of them asked what Poole had been pulled over for, to which Stalnaker responded, “[i]nsurance, improper lane use, littering, and general stupidity.”
Poole testified that Creighton “was very angry” because Poole had thrown water on his truck. In what Poole testified was an effort to calm Creighton down, he offered to wash and wax Creighton’s pickup and to allow Creighton to dump a nearby can of diesel fuel on his own truck. Those offers were declined, and according to Poole’s testimony, Creighton still appeared to be very angry. In what he described as an attempt to de-escalate the situation, Poole lifted his open hands into the air, palms facing out, and said that Creighton could hit him. Videotape at 8:09:55. Creighton queried whether Stalnaker had heard Poole’s invitation. Stalnaker would later testify that, up to this point, Poole had been completely “cooperative,” “calm,” and “cool” and that he intended to let Poole go after issuing him a ticket. Upon learning that Poole had offered to allow Creighton to strike him, however, Stalnaker immediately commanded Poole to turn around. Videotape at 8:10:00 (five seconds after the “hit me” invitation). Creighton grabbed Poole’s arm, prompting Poole to back away and ask why he was being ordered to turn around. Creighton spun Poole around and began twisting his left arm while Stalnaker pinned Poole to his truck. Poole began screaming seconds after Creighton began twisting his arm.
The videotape of these events shows that up to this point, neither officer had commanded Poole to give up his arm. Instead, such a command did not come until 8:10:22, ten seconds after Poole yelled to the officers, “[y]ou guys are breaking my arm.” Videotape at 8:10:12. In the intervening ten seconds, Poole continued to scream. It turned out that Poole’s estimate of the severity of his own injury was conservative: not only was his arm broken, but his elbow was also dislocated. After six surgeries and years of time to heal, he still has trouble using his left arm and hand.
Only after Creighton had been twisting Poole’s arm for some time, and only after Poole screamed that the officers were breaking his arm, did one of the officers command Poole to give up his arm. Videotape at 8:10:22. Stalnaker tased Poole, and Poole fell belly up on the back of his truck. Stalnaker tased him again, and Poole kicked and flailed in Creighton’s direction. The officers eventually lifted Poole by his center of mass off the truck’s gas tank and threw him to the ground. After handcuffing Poole’s broken arm to his non-broken one, the officers called an ambulance.
The majority opinion criticizes this understanding of the facts for “failing to give sufficient weight to the videotape evidence ... and in turn failpng] to consider Poole’s actions from the perspective of a reasonable officer.” (citing Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). It is true that we must “view[ ] the facts in the light depicted by the videotape.” See Scott, 550 U.S. at 381, 127 S.Ct. 1769 (2007). That does not mean, however, that we may usurp the jury’s province to resolve factual disputes. Instead, as the majority opinion acknowledges, it is settled law that where the facts are in dispute at the summary judgment stage (as they are here), we view them in the light most favorable to Poole, the nonmovant. See, e.g., Scott, 550 U.S. at 378, 127 S.Ct. 1769 (explaining that at the summary judgment stage, “courts are required to view the facts and draw reasonable inferences ‘in the light most favorable to the party opposing the [summary judgment] motion ... In qualified immunity cases, this usually means adopting ... the plaintiffs version of the facts” (citing United *637 States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam) (alteration in original))). In sum, critical facts the majority opinion relies upon are in dispute and therefore must be viewed in the light most favorable to Poole.[2]
Graham explains that once we have determined the relevant set of facts by drawing all reasonable inferences in Poole’s favor, we must then evaluate “[t]he ‘reasonableness’ of a particular use of force ... from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.” 490 U.S. at 396, 109 S.Ct. 1865 (citing Terry v. Ohio, 392 U.S. 1, 20-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); see also Hill v. Carroll County, 587 F.3d 230, 234 (5th Cir.2009) (explaining, in the context of an appeal of a qualified-immunity-based summary judgment in favor of officers over a defendant’s excessive use of force claim, that “[wjhen reviewing a grant of summary judgment in the Fourth Amendment context, after first construing disputed historical facts in favor of the non-movant, the court must then ask how a reasonable officer would have perceived those historical facts”).[3]
II.
“The doctrine of qualified immunity protects government officials ‘from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.’ ” Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Therefore, the qualified immunity inquiry has two prongs: (1) whether an official’s conduct violated the plaintiffs constitutional rights,[4] and (2) whether the right violated was clearly established at the time of the violation. Id. at 232, 129 S.Ct. 808; see also Brown v. Callahan, 623 F.3d 249, 253 (5th Cir.2010) (citing Manis v. Lawson, 585 F.3d 839, 843 (5th Cir.2009)). Courts may exercise their discre *638 tion in deciding which question to answer first. Pearson, 555 U.S. at 242, 129 S.Ct. 808.
A.
To determine whether Creighton’s use of force was excessive, and therefore a constitutional violation for purposes of the first qualified immunity question, we ask whether there was “(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.” Ontiveros v. City of Rosenberg, 564 F.3d 379, 382 (5th Cir.2009) (citations omitted). We look only to the objective reasonableness of the use of force, “without regard to [Creighton’s] underlying intent or motivation.” Graham v. Connor, 490 U.S. at 397, 109 S.Ct. 1865 (1989).[5] In Deville v. Marcantel, we explained that to determine “whether the force used is ‘excessive’ or ‘unreasonable’ ” we apply the Graham factors, which include “the severity of the crime at issue, whether [Poole] pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight.” 567 F.3d 156, 167 (5th Cir.2009) (quoting Graham, 490 U.S. at 396, 109 S.Ct. 1865).[6] Objectively con *639 sidering the facts and circumstances at the time the alleged excessive force was used on Poole, each of the Graham factors weighs in Poole’s favor.
1.
First, Poole’s alleged traffic violations were very minor. Deville, 567 F.3d at 167 (concluding that “substantially lower” amount of force was justified where a suspect “was stopped for a minor traffic violation ... than if she had been suspected of a serious crime”).[7]
2.
Second, no reasonable officer could have concluded that Poole posed more than a minimal threat to their safety or the safety of others. Poole was a fifty-six year old unarmed man whom Stalnaker and the defendants’ expert described as “calm,” “cool,” and “cooperative.”
Nevertheless, the majority opinion suggests that an objectively reasonable officer could have perceived Poole to have been a threat based on three of the factors it mentioned: (1) “Poole raised his hands at Creighton and invited Creighton to hit him”; (2) Poole’s driving behavior; and (3) his recent alcohol consumption. As discussed above, the majority opinion is correct that even if we take Poole at his word that by holding his hands up in the air he only meant to de-escalate the situation and submit to Creighton, a reasonable officer could perceive such an action as a threat. Hill, 587 F.3d at 234 (explaining, in the context of a qualified-immunity-based summary judgment, that “when reviewing a grant of summary judgment in the Fourth Amendment context, after first construing disputed historical facts in favor of the non-movant, the court must then ask how a reasonable officer would have perceived those historical facts”).
As for Poole’s driving behavior, although he threw water out of his window, neither officer testified that the water throwing justified anything more than a ticket, much less the significant amount of force that Creighton used against him. Again, until Poole lifted his hands in the air (long after he threw the water), he was “calm,” “cool,” and “cooperative.” Accordingly, Poole’s driving behavior could not have justified Creighton’s use of force in this case.
Poole’s recent alcohol consumption is similarly irrelevant. It is undisputed that he drank only eight ounces of beer at some point that morning and then voluntarily took and passed a field sobriety test. A reasonable officer might perceive a belligerent drunk as a threat, but no reasonable officer could perceive a man who indisputably passed a field sobriety test as a threat merely because he consumed eight ounces of beer at some point that morning.
Accordingly, except for Poole’s raising his hands in the air, palms up, none of the majority opinion’s reasons for concluding that a reasonable officer could have perceived Poole to pose a threat is persuasive. Although virtually all arrestees pose some level of threat to officers,[8] no reasonable *640 officer could think it appropriate to apply such significant force to Poole’s arm simply because he lifted his hands in the air. See, e.g., Deville, 567 F.3d at 167 (“Officers must assess not only the need for force but also ‘the relationship between the need and the amount of force used.’ ” (quoting Gomez v. Chandler, 168 F.3d 921, 923 (5th Cir.1999))).
3.
At the precise time that Creighton applied the force that caused Poole to scream, “[y]ou guys are breaking my arm,” Poole had not yet actively resisted the officers. Videotape 8:10:12. The majority opinion says that it is undisputed that Stalnaker “repeatedly commanded Poole to turn around and give up his right arm,” and “it is undisputed that Poole did not do so,” but the videotape shows that Poole was not commanded to give up his arm until after Creighton twisted it so hard that Poole screamed. Videotape 8:09:55-8:10:22.[9] Indeed, the majority opinion’s account of the facts confirms that Creighton applied the force at issue to Poole’s arm before the officers commanded him to give up his arm:
After this exchange, Stalnaker instructed Poole to turn around. Creighton, who was standing closer to Poole, grabbed Poole’s left arm and attempted to place it behind his back. Stalnaker tried to get Poole’s right arm and again told him to turn around. Poole backed away from officers and said, “Wait a minute. What are you doing?” The two officers twisted Poole around and pressed him against his truck. Creighton held Poole’s left arm behind his back in a way that Poole claimed was very painful. Poole claims that Creighton continued to hold his arm in place while Stalnaker tasered him repeatedly. Stalnaker then reached for Poole’s right arm, but Poole tucked it into his chest and verbally and physically resisted Stalnaker’s repeated stern commands for Poole to give it to him.
Therefore, Poole’s refusal to give up his arm could not have justified the force Creighton used in this case. See also Cyrus v. Town of Mukwonago, 624 F.3d 856, 863 (7th Cir.2010) (holding that refusing to release arms for handcuffing was not active resistance).
The officers also claim that Poole refused their command for him to turn around and that such refusal was active resistance. The videotape shows that Creighton forced Poole to turn around less than ten seconds after Stalnaker’s “turnaround” command. Videotape 8:09:55-8:10:10. During the intervening ten seconds, Poole asks what Creighton is doing and says “excuse me.” Videotape 8:09:55-8:10:10. Merely asking the basis of the instruction could not possibly count as the “active resistance” that Graham instructs courts to consider. See Deville, 567 F.3d 156 at 167 (applying the Graham factors and concluding that refusing an officer’s command to exit the vehicle is passive, not active, resistance); see also Phillips v. Cmty. Ins. Corp., 678 F.3d 513, 525 (7th Cir.2012) (applying Graham factors and distinguishing between active and passive resistance); Cyrus, 624 F.3d at 863 (holding that refusing to release arms for hand *641 cuffing was not active resistance); Mattos v. Agarano, 661 F.3d 433, 450 (9th Cir.2011) (en banc) (“[W]e draw a distinction between a failure to facilitate an arrest and active resistance to arrest.”).
Indeed, in Goodson v. City of Corpus Christi, we found a similar use of force excessive where a suspect put up significantly more resistance by yanking his arm away from an officer and backing away from him in retreat from a command to turn around and put his hands behind his back. 202 F.3d 730, 740 (5th Cir.2000). Even if not turning around immediately does constitute active resistance, however, no reasonable officer could think it justified breaking Poole’s arm and dislocating his elbow. See Rohrbough v. Hall, 586 F.3d 582, 586 (8th Cir.2009) (holding that “de minimis or inconsequential resistance does not justify a substantial use of force”); Shreve v. Jessamine Cnty. Fiscal Ct., 453 F.3d 681, 687 (6th Cir.2006) (holding that passive resistance did not justify significant use of force).
4.
Taking all of the factors together, the Graham analysis cuts in Poole’s favor. He was pulled over for a minor traffic crime and offered virtually no active resistance. The only aspect of his actions that could have justified the use of any force was the “threat” he posed, and the only evidence that he posed a threat was that he lifted his open hands into the air. No reasonable officer could conclude that breaking his arm and dislocating his elbow was an acceptable response to Poole’s conduct.
The majority opinion can conclude otherwise only by failing to analyze the relationship between the degree of force necessary to subdue Poole and the degree of force used — a clear deviation from the excessive force standard that is now long-settled in our circuit. See, e.g., Deville, 567 F.3d at 167 (“Officers must assess not only the need for force but also ‘the relationship between the need and the amount of force used.’ ” (quoting Gomez, 163 F.3d at 923)); see also Collier v. Montgomery, 569 F.3d 214, 219 (5th Cir.2009) (“ ‘[T]he need for force determines how much force is constitutionally permissible.’” (quoting Bush v. Strain, 513 F.3d 492, 501 (5th Cir.2008))); Ikerd v. Blair, 101 F.3d 430, 434 (5th Cir.1996) (“In gauging the objective reasonableness of the force used by a law enforcement officer, we must balance the amount of force used against the need for that force.” (citing Spann v. Rainey, 987 F.2d 1110, 1115 (5th Cir.1993))). Without performing this aspect of the excessive force analysis, the majority opinion gives itself the simple task of proving that some amount of force was constitutional, and excuses itself from the much more difficult task of explaining how any reasonable officer could believe that this much force was necessary to subdue this suspect.
5.
Our circuit’s case law confirms that “the facts that [Poole] has ... shown (see [Fed. R.Civ.P.] 56) make out a violation of a constitutional right.” Pearson, 555 U.S. at 232, 129 S.Ct. 808. In Goodson, we held that fact issues precluded summary judgment in favor of Officers Gaines and Perez on Goodson’s claim that they violated his clearly established Fourth Amendment right to be free from excessive use of force. 202 F.3d at 740. The officers attempted to arrest Goodson for assault, commanding him to put his hands on Gaines’s car. Id. at 734. Like Poole, Goodson testified that he was startled and demanded to know the basis of the officers’ actions. Id. The officers replied that he was being detained and to put his hands on the car. Id. Before Goodson could comply, Gaines grabbed his arm. Id. Goodson pulled his arm away and *642 stumbled backward to “maintain a little distance from the police officers.” Id. At that point, the officers tackled him, broke his shoulder, and handcuffed him. Id. We held that “a fact issue ... exists as to the objective reasonableness of the force used,” and reversed the district court’s grant of qualified immunity in favor of Gaines and Perez, remanding for a trial on the merits. Id. at 740.
Goodson was suspected of assault, a much more serious crime than Poole. Goodson also put up significantly more resistance than Poole. Goodson pulled his arm away and attempted to back away from the officers. Poole, at worst, simply delayed turning around for ten seconds. The officers broke Goodson’s shoulder, an injury similar fi> — -but perhaps not quite as serious — as Poole’s broken arm and dislocated elbow. Thus, Creighton was on notice that the force he used against Poole violated his constitutional rights.
In Deville, an officer stopped Deville for a minor traffic crime, and told her to exit her vehicle. 567 F.3d at 162. She refused and rolled up the window, prompting the officer to radio the off-duty chief of police. Id. The chief arrived on the scene and told Deville he would break her window unless she exited. Id. She still refused to exit, prompting the officers to smash her window, pull her out, and press her against the car. Id. We reversed summary judgment on Deville’s excessive force claim, reasoning that “there [was] a factual dispute over the nature of [her] resistance.” Id. at 167. We held that because Deville had merely refused to comply with the officers’ commands, the officers used excessive force when they smashed her against the car. Id. While some force may have been appropriate to gain her compliance, the jury “could reasonably find that the degree of force the officers used ... was not justifiable.” Id. at 168.
Both Deville and Poole were stopped for minor traffic violations. Id. at 156. Just as officers demanded that Deville exit the car, Creighton and Stalnaker repeatedly demanded that Poole give up his arms— though only after Poole had begun to scream from Creighton’s use of force. Poole offered even less resistance than Deville. Moreover, Deville suffered injuries far less serious than Poole’s: contusions to her wrists, neuropathy of her hands, a right shoulder strain, left shoulder bruising, cuts caused by broken glass, and elbow and jaw pain. See id. at 168 (explaining that “courts may look to the seriousness of injury to determine whether the use of force could plausibly have been thought necessary”). Given that we concluded that the use of even less force was an unreasonably excessive response to even more resistance, it is clear that Creighton violated Poole’s rights in this case as well.
The majority opinion’s attempt to distinguish Deville falls short. Pared down to essentials, the majority opinion distinguishes Deville because the officers in this case decided to place Poole under arrest only “after he acted in a way that they reasonably perceived as threatening.” But in Deville, we also discussed the potential reasonableness of an officer’s perception that Deville might have used her vehicle, which she remained in with the motor running, as a weapon. Id. Accordingly, she posed at least as much of a threat (if not more) than Poole, who was not in his vehicle and merely lifted his opened hands.
Similarly, in Anderson v. McCaleb, we reversed a summary judgment in favor of two Texas police officers and their supervisor, concluding that they had violated Anderson’s right to be free from excessive use of force under the Fourth Amendment. — Fed.Appx.-, No. 11-40237, 2012 WL 2299459 (5th Cir. June 15, 2012) (per curiam) (unpublished). Anderson was *643 driving his car when Officers Lanie Smith and Brant Smith attempted to stop him. Id. at -, 2012 WL 2299459 at *1. Anderson fled on foot, and the officers gave chase. Id. Eventually, Anderson turned around and “held out his hands in an attempt to surrender.” Id. at -, 2012 WL 2299459 at *1. Anderson was holding an iPod, which the officers mistakenly, but reasonably, thought was a weapon. Id. at-, 2012 WL 2299459 at *2. They proceeded to tase him, and Officer Brant Smith hit him with a closed fist. Id. at -, 2012 WL 2299459 at *1. Once they handcuffed Anderson, the officers slammed him on the ground. Anderson testified that he did not resist the officers’ attempt to arrest him. Id. He suffered a sprained knee, a fracture of his right hand, and less serious injuries to his neck and back. Id. We held that clearly established law put the officers on notice that they “could not continue to shock Anderson with the taser after he was no longer resisting arrest.” Id. at-- -, 2012 WL 2299459 at *13-*14. We also held that, under clearly established law, the officers should have known that they “could not beat Anderson after he stopped resisting arrest or slam Anderson to the ground after he was handcuffed.” Id. We drew these conclusions even though Anderson “turned around with an object in his hand [which the officers mistook for a weapon] after fleeing from police, justifying Officer Lanie Smith’s initial use of the taser.” Id. at-, 2012 WL 2299459 at *15.
Anderson’s injuries were similar to Poole’s, but the officers had even greater justification for using force against Anderson. He fled, and the officers reasonably thought he posed a serious threat because it appeared that he had a weapon. Yet we held that a similar amount of force to that used against Poole was unconstitutionally excessive. A fortiori, the amount of force Creighton used against Poole, who did not flee and posed less of a threat to a reasonable officer was even more clearly unconstitutional. Still other cases from our circuit support this conclusion. See, e.g., Staten v. Tatom, 465 Fed.Appx. 353 (5th Cir.2012) (per curiam) (unpublished) (reversing summary judgment and holding that officers were not entitled to qualified immunity to plaintiffs Fourth Amendment excessive force claim where officer tackled automobile theft suspect to the ground after confiscating suspect’s firearm and there were disputed fact issues regarding whether and to what extent plaintiff resisted); Bush, 513 F.3d 492 (holding that officers were on notice, under clearly established law, that slamming battery suspect’s face into a vehicle when she was not resisting or attempting to flee and causing injuries was an excessive use of force that violated suspect’s Fourth Amendment right to be free from unreasonable seizure).
The majority opinion relies heavily on Galvan v. City of San Antonio, a case that we dismissed because of the officers’ “measured and ascending responses.” 435 Fed.Appx. 309, 311 (5th Cir.2010) (per curiam) (unpublished). Galvan does not justify the majority opinion’s holding. There, the officers responded to a 911 call reporting gunshots in a rough neighborhood. Id. at 311. Galvan fled after the officers identified themselves as police. Id. When the police gave chase, Galvan threw something at them. Id. The officers responded by attempting to negotiate. Id. In response to those negotiations, Galvan charged at the officers and tackled one of them. Id. Only after a ground struggle ensued did the officers use arm-manipulation techniques and tase Galvan. Id. We held that the officers did not use excessive force because they reacted only with “measured and ascending responses.” Id. In contrast, Stalnaker pulled Poole over for a trivial traffic crime. Poole did not flee, but rather, in Stalnaker’s words, “was co *644 operative.” Unlike Galvan, Stalnaker told Poole to turn around a single time before he and Creighton immediately pinned Poole against the truck. Poole never threw anything at Creighton or Stalnaker, nor did he tackle them, nor did he engage in a ground struggle. Creighton proceeded to manipulate and break Poole’s arm. As in Deville, Creighton “engaged in very little, if any, negotiation with [Poole].” Deville, 567 F.3d at 168. Simply put, Gal-van provides no support for taking the instant case away from the jury.
In summary, viewing the facts in the light most favorable to Poole, Poole has demonstrated that Creighton’s use of force violated his constitutional rights. Specifically, after Poole was pulled over for a minor traffic violation, put up no active resistance, and gave no indication that he intended to flee,[10] Creighton used clearly excessive and unreasonable force that undisputedly broke Poole’s arm and dislocated his elbow.
B.
Having demonstrated that Poole has satisfied prong one of the qualified immunity analysis under Graham and this circuit’s case law, I turn briefly to prong two. The majority opinion does not decide prong two of the qualified immunity analysis because it concludes that Poole cannot show a constitutional violation, but it notes that the parties do not dispute that the right at issue was clearly established at the time of the alleged misconduct. See Pearson, 555 U.S. at 232, 129 S.Ct. 808 (“Second, if the plaintiff has satisfied [prong one], the court must decide whether the right at issue was ‘clearly established’ at the time of defendant’s alleged misconduct.”). Poole has satisfied prong two because he has shown that “at the time of the challenged conduct, [December 19, 2006,] ‘the contours of [the] right [were] sufficiently clear’ that every ‘reasonable official would have understood that what he [was] doing violate[d] that right.’ ” Ashcroft v. al-Kidd, — U.S. -, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011) (quoting Anderson, 483 U.S. at 640, 107 S.Ct. 3034). Several pre-2006 cases from our circuit put Creighton on notice that the actions Poole has alleged would have violated Poole’s rights. See, e.g., Brown v. Long Beach Police Dep’t, 105 Fed.Appx. 549 (5th Cir.2004) (per curiam) (unpublished) (clearly established right violated where, in the course of arrest for truancy, officers tackled suspect to the ground causing her pelvis to break); Goodson, 202 F.3d 730 (clearly established right violated where officers tackled assault suspect, breaking his shoulder, after he refused to turn around and put his hands behind his back); Randell v. Davis, 986 F.2d 1419 (5th Cir.1993) (per curiam) (unpublished but precedential) (clearly established right violated where suspect fled from officer after minor traffic violation, and, after being handcuffed, officer hit him in the eye with a flashlight causing injury that required stitches).
III.
Because fact issues exist as to whether Creighton is entitled to qualified immunity, I respectfully dissent from the affirmance of summary judgment for Creighton. I concur in the affirmance of summary judgment in favor of all other defendants.

. I agree with the majority opinion that Sergeant John D. Stalnaker, who did not employ the arm-manipulation techniques that caused permanent damage to Poole's left arm and elbow, did not use unreasonably excessive force.

. For example, the videotape evidence does not clearly resolve all factual disputes, including: (1) whether Creighton twisted Poole’s left arm behind his back or simply "held” his arm as the majority opinion describes Creighton's conduct; (2) whether Poole "climbed,” presumably in an attempt to escape, or fell onto the fifth wheel of his truck after being tased by Stalnaker; and (3) exactly which actions by Poole were involuntary physical reactions to the application of the taser and those which were attempts to resist arrest. The majority opinion inappropriately views these factual disputes in the officers' favor.

. For instance, Poole claims that he raised his hands to surrender, but the officers claim that he raised them in a threatening manner. The videotape does not resolve that dispute. Drawing all inferences in Poole's favor, as we must at this stage, it is a fact that he raised them to surrender. Still, though, a reasonable officer could have perceived the gesture as a threat despite Poole’s submissive intentions. When evaluating the reasonableness of Creighton’s use of force, then, we must allow for the possibility that a reasonable officer could perceive it as threatening. On the other hand, in just one example of its failure to construe facts in the light most favorable to Poole, the majority opinion states that Poole "climbed” onto the fifth wheel of his truck immediately after Stalnaker used his taser on Poole. The majority opinion gives no explanation for why it draws this factual inference in favor of the officers. In short, it is the majority opinion that operates from an incorrect view of the facts.

.The majority opinion’s repeated accusations that the dissent somehow ignores or disregards the Supreme Court’s commands not to consider the merits in a qualified immunity case are mystifying. Indeed, the majority opinion devotes the entirety of its analysis to prong one, which the Supreme Court itself has described as the "merits” portion of the qualified immunity analysis. Pearson, 555 U.S. at 240 & n. 2, 129 S.Ct. 808.

. The majority opinion is correct that Creighton’s underlying motives, whatever they were, are irrelevant to our inquiry. Graham, 490 U.S. at 397, 109 S.Ct. 1865. The majority opinion, however, alleges that the dissent considers facts that “are irrelevant to the excessive force qualified immunity analysis.” Not surprisingly, the majority opinion has not explained exactly what facts the dissent has inappropriately considered, given that the legal standard for considering the objective reasonableness of the force used "depends on the facts and circumstances of the particular case ....” See e.g., Collier v. Montgomery, 569 F.3d 214, 218-19 (5th Cir.2009). In this case, these facts and circumstances include all of the events leading up to the time when Poole alleges that excessive force was used by Creighton. Without question, applying the Graham factors requires consideration of the events leading up to the time force was used — thus the majority opinion’s criticism that the dissent inappropriately is "centered on facts preceding Poole’s arrest” is difficult to comprehend.

. The majority opinion is mistaken in its criticism that "the dissenting opinion makes its first mistake by narrowly focusing on Graham to effectively evaluate the merits of Poole’s excessive force claim instead of the validity of Creighton’s claim to qualified immunity.” Instead of applying Graham, the majority opinion would apply "our accepted qualified immunity analysis in the excessive force context, [which] focuses on '(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.' See, e.g., Ontiveros, 564 F.3d at 382.” But this circuit developed the Ontiveros standard for the express purpose of administering Graham itself. See Reese v. Anderson, 926 F.2d 494, 500 (5th Cir.\1991) (explaining that the three-part test from Ontiveros that the majority opinion references was created to implement Graham). In short, the majority opinion suggests replacing Graham with Graham.
The majority opinion's suggestion that it is improper to apply Graham in a qualified immunity case cannot be squared with the fact that the Supreme Court and this circuit have both applied Graham in qualified immunity as well as non-qualified immunity cases. See, e.g., Scott, 550 U.S. at 381, 127 S.Ct. 1769 (applying Graham in a qualified immunity case to determine whether Deputy Scott's actions violated the Fourth Amendment); Hathaway v. Bazany, 507 F.3d 312, 320-21 (5th Cir.2007) (applying the Graham standard to determine whether an officer was entitled to qualified immunity from an excessive use of force claim). Finally, the majority opinion’s criticism of reaching the merits under Graham is particularly confusing because the majority opinion does the very thing it criticizes:
This situation was "tense, uncertain, and rapidly evolving,” and the officers’ decision to use force to restrain Poole was objectively reasonable. Graham, 490 U.S. at 396, 109 S.Ct. 1865. Because Poole, upon refusing to turn around and be handcuffed, *639 posed "an immediate threat to the safety of the officers' and 'actively resist[ed]' ” the officers' instructions, the use of force was not "clearly excessive.” See Deville, 567 F.3d at 167.

. This is based on the assumption that the minor traffic violations are the crimes at issue. The majority opinion does not suggest otherwise, and Creighton and Stalnaker never told Poole what he was pulled over for, what he was being arrested for, or even that he was under arrest at all. It is unclear what charges were brought against Poole, but it is undisputed that all charges against him were dropped.

. The majority opinion is undoubtedly correct that an arrest is "not a parlor game.” The regrettable fact that some arrests go horribly out of control does not relieve us of our responsibility to analyze the degree of force used to effectuate this arrest according to precedent. Specifically, Supreme Court prec *640 edent requires a careful evaluation of the reasonableness of the force used in light of the circumstances of the particular arrest at issue. See Graham, 490 U.S. at 396, 109 S.Ct. 1865.

. The majority opinion indicates that the officers first realized Poole was injured when they handcuffed him and felt that his arm was limp. In light of Poole's unmistakable screams and insistence that his arm was broken, both of which are on the videotape, the majority opinion's view is difficult to square with our duty to view the facts in the light most favorable to Poole.

. The majority opinion states that "Poole's continued escalating resistance” was an indication that he intended to flee. It is unclear what “continued escalating resistance” the majority opinion, references, and there is neither evidence in the record nor even argument from counsel that could plausibly support an intent to flee.